# In the United States Court of Federal Claims

|  |  |
|---|---|
| PETRINA SMITH, | No. 19-1348 |
| *Plaintiff,* | (Filed: December 2, 2022) |
| v. | FLSA collective action; |
| THE UNITED STATES, | conditional certification; |
| *Defendant.* | notice; equitable tolling |

*Walt Pennington*, San Diego, CA, for Plaintiff.

*Rafique Anderson*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**LERNER,** *Judge*.

Plaintiff Petrina Smith worked as an Assistant Canteen Chief ("ACC") for the Department of Veterans Affairs Veterans Canteen Service ("VCS") from September 2012 to February 2019 at locations in Palo Alto and Menlo Park, California.  Compl. ¶ 2, ECF No. 1.  She alleges that the VCS improperly classifies ACCs as exempt from the Fair Labor Standards Act's ("FLSA") overtime pay requirements.  Ms. Smith seeks unpaid overtime pay and moves for conditional certification of a nationwide collective action so that other similarly situated ACCs may opt-in to this suit for overtime wages.

Before the Court is Plaintiff's second motion for nationwide conditional certification.  Plaintiff's first motion was originally filed and assigned to Judge Roumel before the case was transferred to the undersigned.  *See Smith v. United States*, 156 Fed. Cl. 471 (2021) ("*Smith I*").  The United States argued against nationwide certification in response to Ms. Smith's first motion.  At oral argument, it alleged that Ms. Smith failed to present evidence from a sufficiently large group but agreed that a "larger swath" of "nine people" could be enough to demonstrate a similar nationwide policy required to issue notice.  Sept. 21, 2021 Hr'g Tr. at 20:15–21:12, ECF No. 31.  Following partial denial of her first motion on these grounds, Ms. Smith returned with declarations from thirteen other ACCs, who worked at twenty-two VCS canteens representing all fifteen VCS nationwide regions.  Plaintiff now makes a sufficient showing for conditional certification and notice of a nationwide collective action, and Plaintiff's Renewed Motion is **GRANTED**.

I.      **Background**

A.      **Fact Background**

1.      **The Veterans Canteen Service**

The VCS was established by the Department of Veterans Affairs ("VA") in 1946 to provide retail, food, and coffee services to veterans throughout the country.  Pl.'s Mot. Ex. 2 at 2, ECF No. 1-2; *see generally Smith I*, 156 Fed. Cl. at 476.  VCS operates roughly 200 canteens, which are divided into fifteen national regions that encompass all fifty states and Puerto Rico. *See* Pl.'s Renewed Mot. for Conditional Certification and Notice ("Pl.'s Mot.") at 7, ECF No. 55; Def.'s Resp. in Opp. to Pl.'s Renewed Mot. ("Def.'s Resp.") at 4, ECF No. 66; Pl.'s Mot. Ex. 4, ECF No. 55-1 (chart of fifteen regions).  Each region is led by a regional manager, each canteen is managed by a Canteen Chief ("CC"), and each CC supervises as many as six ACCs who are responsible for specific services and operations at the canteen.  Pl.'s Mot. at 7; Def.'s Resp. at 4–5.

VCS employs approximately 3,600 employees, including 400 ACCs.  Pl.'s Mot. at 7; Joseph R. Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 17, 24, ECF No. 55-1 (stating that "[p]robably about 180 locations" employ or employed ACCs during the relevant period).  ACCs are akin to assistant managers or "store managers."  Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 34; Pl.'s Mot. Ex 8, ECF No. 551 (ACC job description).  ACCs "manage their respective departments and hourly lead and non-lead employees," who include the cooks, retail, coffee, and vending employees depending on the size of the canteen.  Def.'s Resp. at 5.  Specific day-to-day work for ACCs varies depending on the number of assigned hourly employees, the sales volume of their canteen, and direction from their CC and regional manager.  *See id.* at 6–8; Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 34:4–12.

Nevertheless, ACCs are all covered by the same national policies governing canteen operations issued by VCS through its central office in Missouri.  Pl.'s Mot. at 13.  These operating policies and job descriptions apply to each ACC, regardless of geographic location, experience level, or pay.  Pl.'s Mot. at 13–14; *see* Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 34:24–35:10, 32:2–7 ("Standard operating procedures, processes, and policies are all standardized."), 64:5–9 (demonstrating policies apply to VCS operations nationwide), 72:2–11 (same); *see also* Def.'s Resp. at 4; *see, e.g.*, Pl.'s Mot. Ex. 5, ECF No. 55-1 (ACC position job description).

VCS national policies also state that ACCs have an eight-hour-per-day, five-day-per-week work shift, called a "tour of duty."  Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 99:9–17; *see* Pl.'s Mot. Ex. 6, ECF No. 55-1 (human resource policy).  ACCs must submit a request to change their tour of duty schedule, as they cannot do so unilaterally.  Abner Martinez Dep., Pl.'s Mot. Ex. 7 at 86:20–22, ECF No. 55-1.  "VCS encourages its managers to operate within the parameters of established schedules."  Pl.'s Mot. Ex. 6.  The national policies also note that "[w]ork beyond these established schedules, however, may be necessary and expected in order to

meet operating demands or customer service standards." *Id.*; Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 99:23–25. According to the VCS, this unscheduled work can occur due to unexpected or national emergencies, or when ACCs "wait until the last minute to get [work] done" or "didn't manage [their] time right." Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 100:15–19.

The same FLSA-exempt classification also applies to ACCs across all VCS locations. Pl.'s Mot. at 11 (citing Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 122:19–24); *see, e.g.*, Pl.'s Mot. Ex. 5 (ACC position job description). Under the FLSA, employees are presumed to be non-exempt from overtime requirements, and thus eligible for overtime pay, unless an employee "clearly meets the requirements of one or more of the exemptions." 5 C.F.R. § 551.202(a) (Office of Personnel Management regulation describing exemptions); 29 C.F.R. §§ 541.100–541.500 (Department of Labor regulations). These exemptions include professional employees, executive employees, and "an employee whose primary duty is management." 5 C.F.R. § 551.205(a).

The FLSA's implementing regulations provide various tests and definitions for a worker's "primary duty" and for terms such as "management." *See, e.g.*, 5 C.F.R. § 551.205(a) (defining primary duty); § 551.104 (primary duty is "the duty that constitutes the major part (over 50 percent) of an employee's work"); *id.* (defining management); *see also* 29 C.F.R. §§ 541.100, 541.700 (Department of Labor regulations for guidance on assistant managers). According to VCS, ACCs are exempt from overtime pay because their primary duty is management. Def.'s Resp. at 33–34. In addition, the use of overtime pay to compensate an ACC for overtime hours used "to meet operating demands or customer service standards" is "not appropriate," and requests for overtime pay are only considered "in relation to unanticipated emergent situations." Pl.'s Mot. Ex. 6. Requests also require written justification approval from the regional manager. *Id.*

## 2.   Plaintiff's Employment

Petrina Smith worked as an ACC at the joint Palo Alto and Menlo Park, California, canteen from September 2012 to February 2019. Compl. ¶ 2. Like all ACCs, she was paid a salary and classified as exempt from the FLSA's overtime requirements. Compl.  ¶¶ 2, 20. Nevertheless, Ms. Smith alleges that she and other similarly situated ACCs were improperly misclassified because most of her work involved non-exempt "manual, rather than managerial, tasks." Compl. ¶ 22. For example, she claims that ninety percent of her working hours involved working "nonexempt duties lacking managerial or discretionary character," such as "preparing and serving food to customers, performing cleaning tasks," "stocking the stores," "making and receiving food," and "ringing the register." Compl. ¶¶ 4, 18, 22–24; *see also* Petrina Smith Decl., Pl.'s Mot. Ex. 11, ECF No. 55-1.

According to Ms. Smith, she routinely worked more than the standard forty-hour workweek, regularly clocking in eighty to ninety-five hours per week. Compl. ¶ 27 (citing 29 U.S.C. § 207(a)). She states that "[a]lthough Defendant's computer system would reflect that Defendant scheduled Plaintiff to work an eight (8) hour shift in a day, Plaintiff often worked

fourteen (14) to fifteen (15) hours per day, if not more."  Compl. ¶ 26; *see* Smith Decl. ¶ 4 ("I was often working up to 14 to 16 hours per day, six days per week.").  Ms. Smith alleges that she consistently worked from six or seven in the morning to nine or ten at night on normal days and from four in the morning to eleven at night during the holiday season or when she was required to deliver goods to other locations.  Compl. ¶ 26.  She also contends that she was regularly called in to work on scheduled days off, resulting in her typically working six days per week.  Compl. ¶ 27.  During one stretch, Ms. Smith was called in to work on an unscheduled fifteenth consecutive day after fourteen days with no day off.  *Id.*  She notes that her "Canteen Chief was aware of the hours we were working and would often see when we were arriving and leaving the canteen," yet "would task us with assignments before and after the scheduled work hours." Smith Decl. ¶ 5.

Faced with this schedule, Ms. Smith alleges that she "complained to management about this practice," yet VCS "took no action."  Compl. ¶ 29.  She points to a 2015 letter she sent to her regional manager and to human resources alerting them that she was working fourteen- to sixteen-hour days, sometimes without meal or rest breaks.  Compl. ¶¶ 26, 29.  She also filed complaints with her three regional managers and four CC supervisors.  *Id.* at ¶ 29.  Despite her protests, Ms. Smith "was told that she was salaried and that she had to stay until her work was complete."  *Id.*  According to her superiors, "working long hours over 8 in a day are expected." Smith Decl. ¶ 9.  All told, Ms. Smith alleges that had she been properly classified as non-exempt, she would have earned approximately $1,808 in overtime pay per week.  *Id.* ¶ 28.

Lastly, Ms. Smith claims that she is not alone.  She alleges that the VCS has a uniform pay practice of misclassifying ACCs as exempt despite their spending the majority of time on non-exempt, manual tasks.  Compl. ¶ 30.  She further states that she witnessed other ACCs at her locations subjected to similar work requirements.  Smith Decl. ¶ 3.

## B.     Procedural Background

Ms. Smith sued the VCS on September 4, 2019, on behalf of herself and all similarly situated current and former ACCs who might be entitled to overtime pay.  Compl. ¶¶ 1–2.  She then filed her first Motion for Nationwide Conditional Certification, on grounds that VCS uniformly misclassified ACCs as exempt in all canteens nationwide.  *See* Pl.'s Mot. for Conditional Certification and Notice, ECF No. 25.  She requested notice for a nationwide collective action, electronic discovery on "all potential opt-in plaintiffs," and equitable tolling of the statute of limitations for potential collective action members.  *See id.*; *Smith I*, 156 Fed. Cl. at 475–76.  The Government opposed a nationwide collective action but consented to limited conditional certification of a collective action covering ACCs at the Palo Alto and Menlo Park locations.  *Smith I*, 156 Fed. Cl. at 476.

### 1.     *Smith I*

In *Smith I*, the court denied Plaintiff's request to provide notice for a nationwide collective action.  156 Fed. Cl. at 480, 485; *see also* Sept. 21, 2021 Hr'g Tr. at 46:15–21 (denying motion on the record); Oct. 15, 2021 Mem. and Order, ECF No. 33 (decision and

order).  Given the limited discovery and "Plaintiff's lone declaration speaking of her experience in two canteens," it held that the evidence Ms. Smith provided at that stage was not enough to show that she was similarly situated to a potential collective of nationwide ACCs.  *Smith I*, 156 Fed. Cl. at 482.  Even under a "modest factual showing" standard to prove an FLSA violation based on an agency's de facto policy, Plaintiff was still required to demonstrate that "potential plaintiffs similarly performed non-exempt work in contravention of facially valid nationwide common policies."  *Smith I*, 156 Fed. Cl. at 480.  But the court found that the range of commonalities between Ms. Smith and other ACCs based on her one declaration—such as job description and listings—only established the VCS's "common classification for ACCs" rather than suggest that "ACCs in other regions were required to perform non-exempt tasks."  *Id.* at 480–81.

Ultimately, the *Smith I* court granted certification and notice to only the Palo Alto and Menlo Park canteen locations where Ms. Smith worked.  *Id.* at 476; *see* Nov. 19, 2021 Order, ECF No. 35; Legal Notice, ECF No. 35–1.  It also encouraged Plaintiff to update her motion for conditional certification after additional discovery.  *See* Sept. 21, 2021 Hr'g Tr. at 46:24–47:3.  On April 13, 2022, the case was transferred to the undersigned.  *See* April 13, 2022 Order, ECF No. 53.[1]

### 2.     Present Motion

The parties undertook additional discovery following the court's order granting limited notice, and on April 21, 2022, Plaintiff filed a Renewed Motion for Conditional Certification and Notice, again requesting nationwide certification of a collective action.  *See* Pl.'s Mot.  Ms. Smith provided substantively more evidence to support finding a nationwide common practice of misclassification.  She submitted declarations from 13 other ACCs who worked at 22 VCS canteen locations throughout the country.[2]  *See* Pl.'s Mot. at 7–8.[3]

---

[1] The court also denied a later motion by Plaintiff to compel discovery of the identities of proposed members for a nationwide action, holding that Plaintiffs failed to bring the motion within the preconditional discovery deadline.  *See* Jan. 20, 2022 Order, ECF No. 40; Jan. 20, 2022 Hr'g Tr., ECF No. 42.

[2] These declarants covered twenty-five unique locations.  Some canteens, such as the Palo Alto and Menlo Park canteen, have two physical locations.  *See* Pl.'s Mot. Ex. 11.  One declarant worked at eleven locations.  *See* Pl.'s Mot. at 7–8 (citing Carter Decl., Pl.'s Mot. Ex. 11, ECF No. 55-1).

[3] The Government also includes declarations from current employees that are meant to refute Ms. Smith's allegations.  Courts do not typically consider these so-called "happy camper" declarations in the two-step framework.  *See Smith I*, 156 Fed. Cl. at 483 & n.6 (citing *McColley v. Casey's Gen. Stores, Inc.*, 559 F. Supp. 3d 771, at 779 (N.D. Ind. 2021)).

## II.    Legal Standards

### A.    Subject Matter Jurisdiction

This Court has jurisdiction under the Tucker Act over claims against the United States founded upon any "Act of Congress."  28 U.S.C. § 1491(a)(1).  Because the Tucker Act only waives sovereign immunity and does not itself create substantive rights, a plaintiff must also identify a separate source of law that can be fairly interpreted as creating a right to money damages.  *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983)).  The FLSA is a money-mandating statute that waives the United States' sovereign immunity and provides subject matter jurisdiction.  *See Abbey v. United States*, 745 F.3d 1363, 1369 (Fed. Cir. 2014).

### B.    FLSA Collective Action Suits

The FLSA requires overtime compensation for employees who work more than forty hours per week.  *See* 29 U.S.C. § 207(a)(1) ("no employer shall employ any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his [or her] employment in excess of the hours above specified.").  The Act allows employees to sue employers collectively for violations of this rule.  Under section 216(b), an action "may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and [o]n behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  Claims made under section 216(b), which are referred to as "collective action" suits, allow for joined claims with other "similarly situated" employees.  *Id.*

Other than the "similarly situated" requirement, the FLSA does not define a mechanism or any other conditions for certification—nor does it define "similarly situated."  *See Gayle v. United States*, 85 Fed. Cl. 72, 77 (2008); *accord Swales v. KLLM Transp. Servs. LLC*, 985 F.3d 430, 434–35 (5th Cir. 2021) (noting "similarly situated" requirement and "[t]hat's it . . .[t]he statute doesn't define similarly situated . . . it says nothing about certification or notice") (cleaned up).  FLSA collective actions are not class action lawsuits and "thus are not subject to the requirements governing class actions set forth in [FRCP] 23 or [RCFC 23]."  *Gayle*, 85 Fed. Cl. at 77.  In 1970, Congress amended the FLSA's collective action procedure to require that "similarly situated" employees opt-in to the collective action via written consent.  *See Swales*, 985 F.3d at 435; *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989) (noting that opt-in requirement was made in response to "excessive litigation spawned by plaintiffs lacking a personal interest in the outcome" of the case).  Unlike class actions that require mandatory opt-outs, collective actions and their opt-in requirement mandate that employees are not bound by the judgment or settlement unless they opted-in.  *Swales*, 985 F.3d at 435.  Within these bounds, "courts have wide discretion to manage joinder in FLSA collective actions."  *Smith I*, 156 Fed. Cl. at 478 (citing *Hoffmann-La Roche*, 493 U.S. at 169–70).

*Smith I* described four, court-developed procedural approaches for collective actions.  *See* 156 Fed. Cl. at 478.  Many courts utilize "a two-step ad hoc approach, comprising a conditional

certification stage and a more rigorous decertification stage." *Id.* at 478 (quotation marks omitted). Some courts "incorporat[e] the provisions of Rule 23 of the Federal Rules of Civil Procedure," while others "incorporat[e] the 'spurious class action' recognized in the pre-1966 version of [Rule 23]." *Gayle*, 85 Fed. Cl. at 77. Finally, the United States Court of Appeals for the Fifth Circuit has devised an approach that emphasizes issuing court-approved notice over certification. *Swales*, 985 F.3d at 439. Under any approach, conditional certification "merely triggers issuance of notice," and "[i]ndividuals can opt in to a FLSA collective action without conditional certification." *Valte v. United States*, 155 Fed. Cl. 561, 567 (2021) (emphasis removed).

In this litigation, "[b]oth parties suggest applying the two-step approach, and they argue exclusively within that framework." *Smith I*, 156 Fed. Cl. at 478. This is also the approach routinely followed in the Court of Federal Claims. *See id.* (collecting cases). Accordingly, this Court analyzes Plaintiff's motion under the two-step framework.

Under step one, "a court may 'conditionally certify' a collective action based on a 'modest factual showing' that the named plaintiffs are similarly situated to a group of absent individuals." *Valte*, 155 Fed. Cl. at 567 (quoting *Gayle*, 85 Fed. Cl. at 77); *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)). "[T]he court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007); *see also Gayle*, 85 Fed. Cl. at 77. Rather, a plaintiff "can satisfy the evidentiary burden . . . by showing that the pleadings, affidavits, and other available evidence support the conclusion that potential class members are similarly situated," meaning that "they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Gayle*, 85 Fed. Cl. at 77 (quoting *Hoffmann-La Roche*, 982 Fed. Supp. at 261) (quotation marks omitted).

A conditionally certified collective "does not produce a class with an independent legal status, or join additional parties to the action." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013); *Smith I*, 156 Fed. Cl. at 479. Nor does it bind absent individuals or bar a potential class member from pursuing her own claim if she chooses not to opt-in to the suit. *Valte*, 155 Fed. Cl. at 566 (first citing *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1105 (9th Cir. 2018), and then *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008)). It only is a "court-created threshold for determining whether to send court-approved notice to absent individuals who appear to be similarly situated to the plaintiffs." *Valte*, 155 Fed. Cl. at 567 (quoting *Genesis Healthcare Corp.*, 569 U.S. at 75).

If a collective is conditionally certified, the parties move to fact discovery. At the close of discovery, a "defendant may move to decertify the collective action on the basis of evidence developed during discovery by demonstrating that the collective action plaintiffs are not similarly situated." *Gayle*, 85 Fed. Cl. at 77. "If final certification is not granted, the court decertifies the class, dismisses the opt-in plaintiffs without prejudice, and permits any remaining individuals to proceed to trial. However, if final certification is granted, the action proceeds to trial on a representative basis." *Smith I*, 156 Fed. Cl. at 479 (quoting § 1807 Collective Actions Under the Fair Labor Standards Act, 7B Fed. Prac. & Proc. Civ. § 1807 (3d ed. 2021)).

## III.    Discussion

### A.    Renewed Motion for Conditional Certification

#### 1.    Plaintiff's Evidentiary Burden

The first step requires that Plaintiff "make a modest factual showing" that potential class members are similarly situated.  *Gayle*, 85 Fed. Cl. at 77.  As in *Smith I*, the parties disagree on Plaintiff's evidentiary burden at this first step.  *See* 156 Fed. Cl. at 479.[4]

Plaintiff argues that the "modest factual showing" required at the first step is a "fairly lenient standard and typically results in conditional class certification."  Pl.'s Mot. at 14 (quotation marks omitted) (quoting *Mitchell v. Acosta Sales, LLC*, 841 F. Supp. 2d 1105, 1115 (C.D. Cal. 2011)).  She frames the question as "whether there is a reasonable basis to conclude that there are 'potentially' similarly-situated class members who would 'benefit' from notice," and not "whether plaintiffs have proven their case that there is a widespread [unlawful policy]."  Pl.'s Mot. at 15 (quotation marks omitted) (quoting *Wellens v. Daiichi Sankyo, Inc.*, No. 13-CV-00581, 2014 WL 2126877, at *4 (N.D. Cal. May 22, 2014)).  Plaintiff argues against imposing anything higher than the "modest" standard, contending that the Court of Federal Claims has never applied a more rigorous standard until the de-certification stage.  *Id.* at 15.

By contrast, the Government points to a line of cases where courts extended the "modest factual showing" standard to a "modest plus" standard when substantial discovery had already taken place.  *See Brown v. Barnes and Noble Inc.*, No. 1:16-cv-07333, 2018 WL 3105068, at *6 (S.D.N.Y. June 25, 2018) (applying heightened standard on renewed motion for conditional certification after initial discovery); Def.'s Resp. at 21–24.  Under the heightened standard, a court looks beyond the pleadings and considers evidence submitted by both parties to analyze whether the plaintiff has progressed in advancing her claims, but still without reviewing the claim's merits.  *See Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 482 (S.D.N.Y. 2016).  This approach is considered a "'sliding scale,' with progressively more scrutiny applied as more evidence enters the record."  *Gaston v. Valley Nat'l Bancorp*, No. 17-CV-1886, 2018 WL 4158407, at *2 (E.D.N.Y. Aug. 30, 2018).  When significant discovery has been completed, courts sometimes skip directly to the factual determinations required by step two of the certification procedure.  *See Korenblum* 195 F. Supp. 3d at 481 (citing *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 482 (E.D. Cal. 2006)).  In line with these cases, the Government argues that, in light of the "extensive discovery completed in this case, the 'modest plus' should apply."  Def.'s Resp. at 21 (citing *Cox v. Ent. U.S.A. of Cleveland, Inc.*, No. 1:13 CV-2656, 2014 WL 4302535, at *2 (N.D. Ohio Aug. 29, 2014)); *see also id.* at 21–22 (collecting cases).

---

[4]  The *Smith I* court did not consider whether the heightened standard is appropriate because "Plaintiff ha[d] not satisfied the more lenient, 'modest factual showing' standard."  *Smith I*, 156 Fed. Cl. at 479.

As an initial matter, the Government's favored standard stands in contrast to the dominant approach.  A majority of courts, and nearly all cases in the Court of Federal Claims, use the "modest factual showing" standard over the heightened standard.  *See, e.g.*, *Boggs v. United States*, 139 Fed. Cl. 375, 379 (2018) (citing *Hoffmann-La Roche*, 982 F. Supp. at 261) (using "modest factual showing"); *Whalen v. United States*, 85 Fed. Cl. 380 (2009) (same); *Gayle*, 85 Fed. Cl. 72 (2008) (same); *Mitchell*, 841 F. Supp. 2d at 1115 (same); *Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010) ("[T]he district courts of this [Second] Circuit appear to have coalesced around a two-step method . . . which . . . we think is sensible," and "[t]he court may send . . . notice after plaintiffs make a modest factual showing.") (internal quotations omitted); *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 224 (3d Cir. 2016) (describing approach, "which has been recognized by the Supreme Court and is widely accepted in most jurisdictions," as including a "modest factual showing" under step one).

Courts use the heightened standard to avoid the "absurd result of granting the parties time to do discovery on the conditional certification question but subsequently imposing no incremental hurdle in determining whether Plaintiffs may send opt-in notices."  *Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 823–24 (N.D. Ohio 2011).  Thus, courts apply the heightened standard when discovery has started.  *See* Def.'s Resp. at 21–22 (collecting cases); *Cox*, 2014 WL 4302535, at *2–3 (following heightened standard after three months of discovery); *Anderson v. McCarthy, Burges & Wolff, Inc.*, No. 1:14-CV-617, 2015 WL 224936, at *3–4 (N.D. Ohio Jan. 15, 2015) (following heightened standard after plaintiffs completed discovery with a two-month extension, even though depositions were not conducted); *Bowman v. Crossmark, Inc.*, No. 3:09-CV-16, 2010 WL 2837519, at *4 (E.D. Tenn. July 19, 2010) (following heightened standard after one year of discovery, interrogatories, depositions, and documents exchanged); *Jungkunz v. Schaeffer's Inv. Rsch., Inc.*, No. 1:11-CV-00691, 2014 WL 1302553, at *7 (S.D. Ohio Mar. 31, 2014) (following heightened standard after limited discovery).

Even under a heightened standard, the incremental shift from "modest" to "modest plus" is limited.  The "modest" standard, while lenient, still requires "substantial allegations, supported by evidence, that the classification was due to a common decision, policy, or plan."  *Smith v. United States*, No. 13-161C, 2014 WL 3940494, at *2 (Fed. Cl. Aug. 11, 2014); *Myers*, 624 F.3d at 555 (quoting *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567 (11th Cir. 1991)).  Meanwhile, the *Creely* court emphasized that review under a heightened standard still "does not touch upon the merits of plaintiff's claims."  789 F. Supp. 2d at 823–24.  "Modest plus" does not impose additional requirements on a plaintiff other than reviewing "whether Plaintiffs have advanced the ball down the field" or demonstrated "some progress as a result of the discovery as measured against the original allegations and defenses" by comparing their original allegations with the factual record assembled through discovery.  *Id.* at 827; *see also Bacon v. Eaton Aeroquip, LLC*, No. 11-CV-14103, 2012 WL 6567603, *3 (E.D. Mich. Dec. 17, 2012) (calling approach the "more restrictive, but still lenient standard").

The primary doctrinal difference from "modest" to "modest plus" is that under a heightened standard, courts look to evidence submitted outside the pleadings.  *See Gayle*,

85 Fed. Cl. at 77, 78 ("Plaintiff can satisfy the evidentiary burden imposed by the first step [with] the pleadings, affidavits, and other available evidence."); *Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 960 (W.D. Mich. 2009).  If the additional evidence outside the pleadings fails to provide "some credible evidence" that plaintiff is similarly situated to a putative collective action, the motion can be denied.  *Gayle*, 85 Fed. Cl. at 77, 78.[5]

This is exactly what Plaintiff requests.  *See* Pl.'s Mot. at 5.  After conditional certification was denied in *Smith I* because of inadequate evidence, Plaintiff submitted new evidence in the form of declarations from thirteen other ACCs and one CC that cover twenty-two VCS canteens spanning all fifteen regions.  *See* Pl.'s App. Ex. 11, ECF No. 55-1 (declarations from ACC Richard Bartoni, ACC Susan Cacciagrani, ACC Mildred Cannary, ACC Cherise Carter, ACC Stacy S. Conn, ACC Joanna Cooper, ACC Kurt Davis, ACC Han Do, CC Jonathan Flagman, ACC Jeanette M. Little, ACC William McCague, ACC Lourdes Quintero, ACC Petrina Smith, ACC William B. Webb, Jr., and ACC Tonya White).  Under both the modest and modest-plus standards, Plaintiff meets her burden.

### 2.    Similarly Situated Factors

To demonstrate that Ms. Smith and potential members of a collective action are "similarly situated," Plaintiff must prove a "factual nexus between . . . her situation and the situation of other current and former employees."  *Gayle*, 85 Fed. Cl. at 79 (quoting *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y. 2005)).  While the FLSA does not define "similarly situated," the Supreme Court has.  Plaintiffs are similarly situated when they share "common issues of law and fact arising from the same alleged [prohibited] activity."  *Hoffmann-La Roche*, 493 U.S. at 170; *see Valte*, 155 Fed. Cl. at 570 (describing lack of definition).  Courts use an ad hoc approach that considers common factors, including: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."  *Valte*, 155 Fed. Cl. at 570 (quoting *Thiessen*, 267 F.3d at 1103) (cleaned up); *see, e.g.*, *Meyer v. Panera Bread Co.*, 344 F. Supp. 3d 193, 207–08 (D.D.C. 2018) (discounting case manageability concerns at the stage one analysis); *Creely*, 789 F. Supp. 2d at 828 (N.D. Ohio 2011) (same); *Smith I*, 156 Fed Cl. at 483 (considering case manageability concerns); *Gayle*, 85 Fed. Cl. at 78–79 (denying motion for nationwide conditional certification after considering plaintiff's affidavit and declaration from two coworkers but no evidence of nationwide policy); *Valte*, 155 Fed. Cl. at 574–75 (denying conditional certification after considering "inconsistent" declarations in job requirements and duties).  This approach typically requires more than a statement from one individual at one location.  *Id.*; *Gayle*, 85 Fed. Cl. at 78 ("[P]laintiff must

---

[5]  For example, the Government cites *Pacheco*, which used a "more restrictive" standard, but explained that there was "a sufficient evidentiary record to determine whether this action [could] be managed on a collective basis . . . on the evidence rather than the pleadings."  671 F. Supp. 2d at 960.  This is not far from what Plaintiff requests: that the Court consider the additional evidence outside the pleadings.

offer some credible evidence that other potential plaintiffs are similarly situated." (citing *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 321 (S.D.N.Y. 2007)).

In *Smith I*, the court explained that the "plaintiff can make the requisite 'modest factual showing' by offering evidence that the plaintiff and other putative collective action members share 'common issues of law and fact arising from the same alleged prohibited activity.'" *Smith I*, 156 Fed. Cl. at 479 (quoting *Barry v. United States*, 117 Fed. Cl. 518, 521 (2014)).  This only requires that "some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA."  *Id.* (citing *Gerlach v. Wells Fargo & Co.*, No. C 05-0585, 2006 WL 824652, at *2 (N.D. Cal. Mar. 28, 2006)).  Among other factors, *Smith I* considered:

- The ACCs' primary job duties, which included "time spent preparing, making and serving food to canteen customers, performing cleaning tasks, ringing the registers, manning the counters and stocking the stores," *id.* at 481;
- Variations in ACC job duties between locations, noting ACC duties are "directed by the Chiefs who supervised the Assistant chiefs" and "aspects of the overtime policy Plaintiff references are all vested in the discretion of Canteen Chiefs and regional managers," *id.* (emphasis omitted);
- Testimony from the VCS's 30(b)(6) witness on the uniformity of ACC job descriptions and status, as well as their instruction from CCs and regional managers, *id.*;
- Variations in salary ranges across locations, *id.* at 482; and,
- Case management considerations, including the potential that the court might need "to analyze the individual experiences of up to 600 employees at the decertification stage."  *Id.* at 483.

Ultimately, the *Smith I* court held that Ms. Smith failed to show she was similarly situated to other ACCs, specifically "with respect to the claim" being made—the VCS's de facto misclassification policy under the FLSA.  *Id.* at 481 (citing *Jibowu v. Target Corp.*, 492 F. Supp. 3d 87, 122–23 (E.D.N.Y 2020)).  The court found that without additional evidence, Ms. Smith's claim "turns on decisions made by Chiefs at the two canteen locations where she worked" and that "[n]one of the commonalities that Plaintiff alleges she shares with other ACCs suggest that ACCs in other canteens also worked under Chiefs who consistently assigned non-exempt duties to them."  *Id.* at 481.

### 3.    Analysis

#### a.   Ms. Smith Is Similarly Situated to Assistant Canteen Chiefs at Canteen Locations Nationwide.

The updated evidence in Ms. Smith's Renewed Motion is sufficient to meet the factual burden.  Unlike an explicit policy violation, which requires pointing to specific VCS policies and procedures, allegations of an illegal de facto policy are "demonstrated through a showing of the

illegal application of a common legal policy—*i.e.*, that employees nationwide who, though classified as exempt, nevertheless performed primarily non-exempt work." *Stevens v. HMSHost Corp.*, No. 10-cv-3571, 2012 WL 13098466, at *2 (E.D.N.Y. 2012) (citing *Jenkins v. TJX Cos. Inc*, No. 10-CV-3753, 2012 WL 1099964, at *3 (E.D.N.Y. Mar. 31, 2012)). Such a showing depends on the experience of enough individuals to indicate that the common policy applies nationwide. Nevertheless, plaintiffs generally "need not submit a large number of declarations or affidavits." *Harris v. Vector Mktg. Corp.*, 716 F. Supp. 2d 835, 838 (N.D. Cal. 2010).

The range of declarations from thirteen individuals covering twenty-two canteens (and twenty-five locations) spanning all fifteen national regions numerically exceeds the vast majority of cases finding nationwide conditional certification. *See Smith I*, 156 Fed. Cl. at 483; *see, e.g.*, *Amador v. Morgan Stanley & Co.*, No. 11-cv-4326, 2013 WL 494020, at *5 (S.D.N.Y. Feb. 7, 2013) (relying on evidence from eleven individuals from thirteen locations in nine states); *Crosby v. Stage Stores, Inc.*, 348 F. Supp. 3d 742, 746 (M.D. Tenn. 2018) (relying on evidence from twelve individuals from eight locations in five states); *Meyer*, 344 F. Supp. 3d at 201 (relying on evidence from seven individuals from six states); *Stevens*, 2012 WL 13098466 at *3 (relying on evidence from four individuals from three states); *Vasto v. Credico (USA) LLC*, No. 15 Civ. 9298, 2016 WL 2658172, at *10, 15 (S.D.N.Y. May 5, 2016) (relying on evidence from nine individuals from ten locations in four states); *Cowan v. Nationwide Mut. Ins. Co.*, No. 2:19-cv-1225, 2019 WL 4667497, at *6, 9 (S.D. Ohio Sept. 25, 2019) (relying on evidence from nine individuals from four locations in four states); *Higgins v. Bayada Home Health Care, Inc.*, No. CV 3:16-2382, 2018 WL 8368874, at *1 (M.D. Pa. May 11, 2018) (relying on evidence of ten individuals in four states); *see also* Pl.'s Reply Mem. in Supp. of Pl.'s Renewed Mot. ("Pl.'s Reply") at 20, ECF No. 67 (collecting cases).

"Where plaintiffs allege such idiosyncratic conduct across multiple locales, it is reasonable to infer that the same pattern of behavior occurred at defendants' other active sites." *Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265, 271 (S.D.N.Y. 2012). And here, Plaintiff's declarants all point to the same breadth of conduct and work conditions. First, they uniformly attest that they spend seventy- to ninety-percent of their time on non-exempt, manual tasks. *See* Pl.'s Mot. at 8. Indeed, all thirteen declarants claim that "most," "eighty percent," or "ninety percent (sometimes more)" of the time was spent on manual tasks. *See* Bartoni Decl. ¶ 3 ("I would estimate that I spent most of my time performing these types of manual tasks."); McCague Decl. ¶ 4 ("80–90% of my time" on manual tasks); Cannary Decl. ¶ 3 ("ninety percent (sometimes more)" on manual tasks); Davis Decl. ¶ 3 ("seventy percent of my time" spent on manual tasks); Cacciagrani Decl. ¶ 3 ("eighty percent of my time" on manual tasks); Carter Decl. ¶ 5 (eighty percent); Conn Decl. ¶ 3 (eighty percent); Cooper Decl. ¶ 3 (eighty percent); Do Decl. ¶ 3 (eighty percent); Little Decl. ¶ 3 (eighty percent); Quintero Decl. ¶ 3 (eighty percent); Webb Decl. ¶ 3 (eighty percent); White Decl. ¶ 3 (eighty percent).

This stands in contrast to the stated policy at VCS that "management activities" are the primary duty. Def.'s Resp. at 5. At this first non-merits stage of the two-step conditional certification, Ms. Smith must only make a "minimal showing that potential plaintiffs similarly performed non-exempt work in contravention of the facially valid nationwide common policies."

*Smith I*, 156 Fed. Cl. at 480.  Whether ACCs still fall into the executive exemption of the FLSA's overtime requirement is a question that goes to the merits.  This is true even if they spend more than fifty percent of their time performing non-exempt duties.  *See* 29 C.F.R. § 541.700(b) ("Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."); *see* Def.'s Mot. at 16, 29.  Therefore, the extent to which ACCs' actual work differed from their primary duty as outlined in their job description and in VCS official policies—that is, "manage the day-to-day operations"—is a question for the next step.

Next, the declarants claim that ACCs routinely worked overtime hours.  *See* Bartoni Decl. ¶ 5 ("I was supposed to work eight hours per day from 6:30 a.m. to 3:00 p.m., with a 30-minute meal break.  However, I routinely worked two to three hours beyond my scheduled hours because of understaffing."); *id.* ¶ 6 (stating they typically worked 50–60 hours per week); Cacciagrani Decl. ¶¶ 4–5 ("[I] often work[ed] on weekends" and typically worked "55–60 hours per week"); Cannary Decl. ¶ 4 ("I was often working up to 12 to 14 hours per day, 5 days per week.  There were many weeks when I worked up to eighty (80) hours per week."); Carter Decl. ¶ 6 ("I often worked more than . . . 12 hours per day, five days per week, plus some Saturdays."); Conn Decl. ¶ 4 ("I was often working 10 to 12 hours per day."); Cooper Decl. ¶ 4 ("I am often working 10 to 12 hours per day, as are the other ACCs."); Davis Decl. ¶ 4 ("I was often working up to 10 to 12 and sometime[s] 14 hours per day, six days per week."); Do Decl. ¶ 5 (stating they typically worked 45–50 hours per week); Little Decl. ¶ 4 ("I was often working between 10 to 16 hours per day."); Quintero Decl. ¶ 4 ("I was often working up to 10 to 12 hours per day, five days per week, plus up to eight hours on a Saturday."); Webb Decl. ¶ 4 ("I was often working up to 12 to 15 hours per day, five days per week, plus up to eight hours on a Saturday.").

Similarly, the declarants represent that ACCs may not amend their "tour of duty" work schedule to avoid overtime hours.  Pl.'s Mot. at 10–11; *See* Bartoni Decl. ¶ 6 ("I was not able to change my preset schedule."); Cacciagrani Decl. ¶ 5 (same); Cannary Decl. ¶ 5 (same); Carter Decl. ¶ 6 (same); Conn Decl. ¶ 6 (same); Cooper Decl. ¶ 5 (same); Do Decl. ¶ 5 (same); McCague Decl. ¶¶ 5–6 (same); Quintero Decl. ¶ 6 (same); Webb Decl. ¶ 6 (same); White Decl. ¶ 6 (same).

The declarants also state that supervisors, CCs, and regional managers were well aware of these excessive work hours—sometimes even giving them out-of-hours assignments.  *See* Pl.'s Mot. at 12; Cannary Decl. ¶ 5 ("The Canteen Chief . . . would task me with assignments before and after the scheduled work hours."); White Decl. ¶ 6 ("I complained" and was informed "that 50 hours were required, and more was often needed on top of that minimum."); Quintero Decl. ¶ 8 ("During one or more of the[] national phone conferences, I was informed that Assistant Chiefs needed to work at least 50 hours per week.").  Despite the excessive hours worked, ACCs were not paid overtime, but rather "expected to work at least 50 hours per week." Webb Decl. ¶ 6, 9; *see* Bartoni Decl. ¶ 6 (demonstrating they were not paid overtime); Cacciagrani Decl. ¶ 5 (same); Cannary Decl. ¶ 5 (same); Carter Decl. ¶ 8 (same); Conn Decl. ¶ 5 (same); Cooper Decl. ¶ 5 (same); Davis Decl. ¶ 5 (same); Do Decl. ¶ 5 (same); Little Decl. ¶ 5

(same); McCague Decl. ¶ 6 (same); Quintero Decl. ¶ 6 (same); Webb Decl. ¶ 6 (same); White Decl. ¶ 6 (same).

Finally, the declarants collectively represent twenty canteens and twenty-five specific locations, providing evidence of nationwide geographic diversity.  VCS divides the national map into fifteen regions, and Plaintiff's declarants represent each of them.  *See* Bartoni Decl. ¶ 2 (Palo Alto and Menlo Park, California); Cacciagrani Decl. ¶ 2 (Boston, West Roxbury, Bedford, and Brockton, Massachusetts); Cannary Decl. ¶ 2 (Waco, Texas); Carter Decl. ¶¶ 2–3 (Fresno, Martinez, and San Francisco, California, as well as short periods of time at other locations: Eugene and White City, Oregon; Boise, Idaho; Poplar Bluff, Missouri; Monterey, California; Harlingen, Texas; Las Vegas, Nevada); Conn Decl. ¶ 2 (West Haven, Connecticut); Joanna Cooper Decl. ¶ 2 (New Orleans, Louisiana); Davis Decl. ¶ 2 (Washington, District of Columbia); Do Decl. ¶ 2 (Loma Linda, California); Flagman Decl. ¶ 2 (Seattle, Washington; Palo Alto, California; and Muskogee, Oklahoma); Little Decl. ¶ 2 (Loma Linda, California); McCague Decl. ¶ 2 (Pittsburgh, Pennsylvania); Quintero Decl. ¶ 2 (Seattle, Washington); Webb Decl. ¶ 2 (Los Angeles, California); White Decl. ¶ 3 (Seattle and Tacoma, Washington); *see* Pl.'s Mot. at 7.

In total, Ms. Smith provides evidence of declarants' experiences in twenty-two canteens in thirteen states and the District of Columbia.  Each declaration corroborates the claims in Ms. Smith's complaint: ACCs are classified as FLSA exempt, yet they work on primarily non-management tasks over which they lack control, and they are not appropriately compensated for this work.  *See* Compl.  Combined with Plaintiff's prior evidence that ACCs share the same nationwide job descriptions, job postings, FLSA classification, and other nationwide policies, the evidence from the declarations meets the necessary factual showing.  *See* Pl.'s Mot. Ex. 5, 6, 8.  Under either the "modest" or "modest plus" standard, Ms. Smith provides "substantial evidence, supported by the allegations" of a common de facto misclassification.  *See Smith*, 2014 WL 3940494, at *2; *Mitchell*, 841 F. Supp. 2d at 1115 (noting that standard is "fairly lenient" and "typically results in conditional class certification").

Indeed, during a hearing on Plaintiff's initial motion, Government counsel stated that a plaintiff "need[s] anywhere between . . . 9 to 100 people that say we also have a similar policy and we're also affected in the same or similar fashion."  Sept. 21, 2021 Hr'g Tr. at 20:16–19.  Under questioning, counsel agreed that:

> Hypothetically, if [the Court] had a larger swath—so say you had nine people, one from St. Louis, one from New York, one from Puerto Rico or one from Portland, Oregon, you could say, you know what, there's 50 states, there's VCS in all 50 states and including Puerto Rico.  I don't need all 50 as a judge, but you know what, 9, so I can sort of see that . . . geographically, the way it's spread, the way that they're kind of disconnected from each other, I can sort of see where there may be at least enough for me to issue notice that you may be part of the lawsuit.

*Id* at 21:1–12.

In line with the Government's stated standard, Plaintiff subsequently collected thirteen declarations from twenty-two national canteens, including outside the cities of St. Louis, New York, and Portland, as the Government suggested at oral argument. *See* Carter Decl. ¶ 3 (covering Eugene and White City, Oregon, and Poplar Bluff, Missouri); Conn Decl. ¶ 2 (covering West Haven, Connecticut). Faced with this new evidence, the Government moves the goalposts, claiming "she relies on only 12 declarations as []allegedly representative of the duties and responsibilities of more than 600 ACCs nationwide." Def.'s Resp. at 32. But Plaintiff's additional evidence is sufficient to meet the standard previously articulated by the Government and in *Smith I*.

### b. There Is a Sufficient Showing of a De Facto Misclassification Practice.

At this stage, factual findings about whether a de facto nationwide policy exists are neither necessary nor permitted. *Gayle*, 85 Fed. Cl. at 77. Rather, Plaintiff's burden is to provide facts sufficient to support nationwide conditional certification based on allegations of an unlawful de facto policy as presented in the record. *See Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 479–80 (S.D.N.Y. 2016) ("[P]otential members must be similarly situated with respect to the allegedly unlawful policy or practice."). Ms. Smith has submitted evidence sufficient to meet step one's threshold requirement for similarly situated ACCs facing the same de facto FLSA misclassification practice and policy.

The Government's arguments against nationwide conditional certification for lack of a nationwide policy are unpersuasive. First, the Government claims that "Ms. Smith fails to offer any evidence or argument suggesting that VCS's official policies with respect to ACCs are unlawful." Def.'s Resp. at 26. The Government contends that Ms. Smith cannot allege an unlawful official policy because all ACC duties are primarily management tasks within the ambit of the FLSA's executive exemption, including directing the work of employees; management tasks like initiating cost saving measures and employee productivity; planning and apportioning work; and making recommendations as to hiring and firing. *Id.* at 26, 27. This is largely correct. The VCS policies state that ACCs have the primary responsibility of "management," situating them as assistant managers outside the FLSA's overtime requirements. However, this finding is also immaterial to Plaintiff's claim—that the VCS has a de facto policy resulting in misclassification. *See* Pl.'s Mot. at 17 (alleging a "*de facto* nationwide practice"); Pl.'s Reply at 9 ("Defendant relies on its depiction of a 'lawful' job description and policies. . . . However, Plaintiff asserts a *de facto* pattern and practice in contravention of the formal policies.") (internal citations omitted). For a de facto allegation, a plaintiff need only show a violation of a common policy.

Moreover, these facially valid policies would be meaningless if VCS managers employed a different set of unwritten considerations for scheduling ACCs—such as their inability to protest their hours. As the Government itself recognizes:

> A court cannot determine whether an employee primarily engaged in exempt managerial duties based solely on "the number of hours that the employer,

according to its job description or its estimate, claims the employee *should* be working." If it did, "then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality." Similarly, a court cannot solely rely on an employee's reported hours because the employee could then evade a valid exemption through his own substandard performance. To steer clear of these two pitfalls, the court should consider the realistic requirements of the job. Nonetheless, first and foremost, the court should consider how the employee *actually* spends his or her time.

*Velazquez v. Costco Wholesale Corp.*, 603 F. App'x 584, 586 (9th Cir. 2015) (citations omitted) (emphasis added) (citing *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 855 (1999)); *see* Def.'s Resp. at 37. And according to Ms. Smith and declarants, ACCs *actually* spend their time working on non-management duties.

In the vein of analyzing an ACC's actual duties, the Government's main contention is that "there is no common thread to tie together a nationwide claim of ACCs" because VCS has no "common unlawful policy." Def.'s Resp. at 23, 27. "[D]espite what VCS expects and intends for its ACCs to do, their actual duties—as required by their CC and regional manager— place them outside the executive exemption." *Id.* According to the Government, Plaintiff's similarly situated claim lacks a common thread because all evidence turns on "what each potential plaintiff does on a daily basis as required by his or her CC/regional manager that is different than what is contained in the position description as a primary duty." *Id.* at 27–28. Any analysis by this Court would have to be "an individualized, fact-intensive analysis of that manager's job duties and responsibilities . . . for each proposed plaintiff." *Id.* at 28 (citing *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220–21 (D. Conn. 2003)).

As an initial matter, the VA's decision to classify all ACCs as exempt is a nationwide policy. *Compare Stevens*, 2012 WL 130984466, at *2, *and Summa v. Hofstra Univ.*, 715 F. Supp. 2d 378, 386 (E.D.N.Y. 2010) (granting conditional certification because of "Hofstra's common policy of classifying Undergraduate and Graduate Assistants as exempt or otherwise excluded from the provisions of the FLSA"), *with Crawley v. United States*, 145 Fed. Cl. 446, 449, 450–51 (2019) (denying nationwide certification because local human resources managers, not national policy, set FLSA exemption determinations for each position). *See* Nov. 2, 2022 Hr'g Tr. at 11:25–12:13, ECF No. 72. The Government is incorrect that the VCS's common classification policy is unimportant. *See* Nov. 2, 2022 Hr'g Tr. at 12:10–23. While true that a classification policy alone might not be enough to find that potential plaintiffs are similarly situated, the uniform classification lends credence to a common employer practice and unlawful misclassification.

Similarly, VCS has a host of other uniform national policies related to work hours, primary duty requirements, and job tasks. *See* Pl.'s Mot. at 13–14. The Government de-emphasizes its national policies and argues that it is up to each individual CC to manage ACCs. Def.'s Resp. at 40. Thus, the CCs would be responsible "for violating the FLSA; not the VCS as a whole or its central management staff." *Id.* However, it is precisely these national policies that

set ACC's pay, determine overtime, classify their FLSA status, and create the internal infrastructure for setting the forty-hour tour of duty. *See* Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 34:24–35:10, 32:2–7, 64:5–9, 72:2–11; *see also*; Pl.'s Mot. Ex. 5. Even if CCs and regional managers have discretion over ACC work schedules, they are still bound by nationwide policy and limited to a secondary role of implementation. Put simply, the VCS sets the policy and the CCs implement it.

Moreover, the Government's demand for a "common unlawful policy" is not required. Def.'s Resp. at 23, 27. Rather, many courts hold that "[b]eing similarly situated means that one is subjected to some common employer *practice*." *Valte*, 155 Fed. Cl. at 571 (emphasis added) (quoting *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 538 (3d Cir. 2012); *see also, e.g.*, *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988) ("[C]ourts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan infected by discrimination."); 7 Newberg on Class Actions § 23:39 (5th ed.) (describing policy as "some common employer practice").

Some courts do not require a common policy at all, as long as there is other commonality. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996) ("We also hold that a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b)."); *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009) ("Showing a 'unified policy' of violations is not required."), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). Even when applying the highest level of scrutiny, courts only require that potential plaintiffs are together "'victims of a single decision, policy, or plan,' regardless of whether FLSA violations continued to occur after that time." *Tolentino v. C & J Spec-Rent Servs. Inc.*, 716 F. Supp. 2d 642, 654–55 (S.D. Tex. 2010) (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 n.8 (5th Cir. 1995)); *see also Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1302 (11th Cir. 2008). Regardless of whether there is a policy, if enough ACCs have the same unlawful working experience because of a common employer act, this is enough to find commonality.

As described above, Ms. Smith and the other ACCs who provided declarations face the same issues under VCS's policy classifying them as FLSA exempt. Plaintiff also makes a minimal showing of an alleged common de facto policy of working on primarily non-management tasks for more than forty hours per week, a purported misclassification under the FLSA. For example, VCS has a written policy that ACCs "are assigned work schedules that do not exceed 8 hours a day or 40 hours per week" other than exceptions such as "meet[ing] operating demands or customer service standards." Pl.'s Mot. Ex. 6; *see* Tober 30(b)(6) Dep. at 99:9–17, 99:4–8 ("Q: . . . [I]s it fair to say it's an expectation that assistant chiefs would work over 40 hours to meet operating demands or customer service needs? A. No. We expect them to work their tour of duty."). Nevertheless, Plaintiff alleges there exists an unwritten expectation that ACCs must work more than forty hours per week, regardless of operating demands or customer service standards. *See* Webb Decl. ¶ 9 (ACC was told he was "expected to work at least 50 hours per week"). One declarant, "[d]uring one or more of the[] *national* phone conferences . . . was informed that Assistant Chiefs needed to work at least 50 hours per week."

Quintero Decl. ¶ 8 (emphasis added).  Plaintiff provides sufficient evidence to find an unstated but openly condoned nationwide policy.

Regarding work schedules, the VCS appears to blame ACCs for allegedly poor time management or bad delegation for working over forty hours per week.  For example, the agency's 30(b)(6) witnesses explained, "an assistant manager is responsible to prioritize work . . . *That's called 'planning,'* . . . [I]f they don't do it right, they are going to get behind." Tober 30(b)(6) Dep., Pl.'s Mot. Ex. 3 at 101:17–24 (emphasis added); *id.* at 100:20–101:4 ("[I]f you know you've got end-of-month food inventories that have to be done within a certain amount of time and you don't get ready for the food inventory until Friday, the Saturday before they are due, and you are going to come in or you're staying late to get ready for inventory because you didn't manage your time right or you didn't — the assistant manager didn't delegate that responsibility . . . that's on them to do.").

But according to Ms. Smith and the declarants, CCs would regularly "task [ACCs] with assignments before and after the scheduled work hours," even though the manager was aware of the ACC's work hours.  Cannary Decl. ¶ 5; *see also* Cacciagrani Decl. ¶ 5 (same); Carter Decl. ¶ 8 (same); Conn Decl. ¶ 5 (same); Cooper Decl. ¶ 5 (same); Davis Decl. ¶ 5 (same); Do Decl. ¶ 5 (same); Little Decl. ¶ 5 (same); McCague Decl. ¶ 5 (same); Quintero Decl. ¶ 6 (same); Smith Decl. ¶ 5 (same); White Decl. ¶ 6.  Other declarants believe understaffing explains their excessive overtime work, such as for one ACC who took over the hourly worker roles for a missing breakfast and lunch cook.  *See* McCague Decl. ¶ 4 ("Since approximately October of 2020 to the present day, I have been the breakfast cook.  For approximately the last year, from June 2021 to the present, I have also been the lunch cook."), ¶ 6 ("The workload we are given would cause us to work well past 8 hours a day, as the work required would not be able to be done in an 8-hour day, *especially while doing hourly employee jobs for most of the day*.") (emphasis added); Bartoni Decl. ¶ 5; Webb Decl. ¶ 8 (" I . . . was mostly unable to attend [national phone conferences] because I was too busy filling in for other employees."); White Decl. ¶ 7 ("We worked so much due to staff shortages and we never really had our breaks or lunch but the Chief had his breaks."); *see also* Cacciagrani Decl. ¶ 5 (noting that she worked on weekends because "there is so much to be done").  This contrasts with the VCS's position that ACCs perform hourly roles only "in the event of a significant staffing shortfall" or "national emergency."  Joseph R. Tober 30(b)(6) Dep., Def.'s Resp. Ex. 3, 37:10–38:2 ("In terms of a recurring duty, no.  I can tell you assistant managers make a heck of a lot of money.  I'm not going to pay them 60–, \$70,000 a year to flip hamburgers.").

These declarant statements make a sufficient showing of a de facto policy of scheduled work beyond forty hours, without regard for operating requirements or customer service. Because "[t]he expectation was to stay until the work was done," no amount of "manag[ing] your time right" by ACCs would appear to mitigate their work schedules.  Smith Decl. ¶ 9.  Instead, "planning" in order to work fewer hours seems a Sisyphean task subject to the whims of supervisors and understaffing.  This common policy or practice also appears sanctioned by VCS CCs and regional managers, who "reminded [ACCs on national calls] that expectations for managers were 50 hours or more to get the job done."  White Decl. ¶ 8; *see also* Webb Decl. ¶ 8

(same); Smith Decl. ¶ 9. Unlike hourly employees, who are paid for overtime hours, the VCS can seemingly lean on ACCs to get the job of hourly employees done, unpaid. It constitutes a "showing of the illegal application of a common legal policy—*i.e.* that employees nationwide who, though classified as exempt, nevertheless performed primarily non-exempt work." *Stevens*, 2012 WL 13098466, at *2.

The Government focuses on "what each potential plaintiff does on a daily basis as required by his or her CC/regional manager." Def.'s Resp. at 27–28. It stresses the individual experiences of ACCs, arguing that the variability in day-to-day ACC work prevents a finding of a common practice. *See id.* at 34–36. However, the FLSA's similarly situated requirement does not recognize this as a consideration. Courts are instead instructed to consider the "disparate factual and employment settings of the individual plaintiffs," "the various defenses available to the defendant which appear to be individual to each plaintiff," and "fairness and procedural considerations." *Valte*, 155 Fed. Cl. at 570.

And, in considering the various factual and employment settings of the individual plaintiffs, courts routinely look at a panoply of factors, none of which is predominant. *See, e.g.*, *Barry*, 117 Fed. Cl. at 521 (considering whether the proposed class members occupied the same positions in the same specific job series under the general schedule); *Whalen*, 85 Fed. Cl. at 385 ("Defendant's objection that 'distinctions [exist] in . . . job titles, functions, or pay' will not stand in the way of conditional certification when an overarching nexus is present. In their declarations, potential members of the collective action have averred, based on relevant personal knowledge, that all [employees] are affected by the same [agency] policies and procedures.") (citations omitted); *Crawley*, 145 Fed. Cl. at 449, 450–51 (denying nationwide certification because local human resources managers, not national policy, set FLSA exemption determinations for each position and there was no evidence of the FLSA violation beyond a single facility); *Briggs v. United States*, 54 Fed. Cl. 205, 207 (2002) (holding "allegation that [plaintiff] was aware of workers in as many as five states who had failed to receive overtime pay" was not sufficient for national certification because the allegation "offer[ed] no specific support for the allegations of a violation (e.g., names, dates, places, types of unlawful action, etc.)"). These cases highlight that courts should not look at the specific daily experience, but instead at whether a plaintiff demonstrates that "they and other[s] were similarly situated with respect to the claim that they were required to perform non-managerial job duties in contravention of the formal job description." *Jibowu*, 492 F. Supp. 3d at 122–23.

Further, the Government's focus on variation at each canteen places undue emphasis on the lowest level of generality, or each ACC's day-to-day experience. For example, the Government highlights how some of Plaintiff's declarants participate in the hiring process or engage in other management tasks. *See, e.g.*, Def.'s Resp. at 31–32 (citing declarations from Cannary, Quintero, Webb, and McCague). Some ACCs have unique responsibilities, some have responsibility for multiple departments, and some have "varying degrees of responsibility with regard to hourly worker supervision, administrative duties, and operational responsibility of the facility." Def.'s Resp. at 34–36.

But "actual evidence of a factual nexus between their situation and the persons they claim are similarly situated" does not require such specificity. *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 460 (E.D.N.Y. 2014) (cleaned up). The Government's position also creates an impossible burden. If a potential plaintiff cannot assert commonality because of some variation in individual experience and the fact that nationwide management decisions are implemented at the local level, then a plaintiff could never establish they were similarly situated on a large scale. Such a reading would allow an employer to skirt collective actions, as well as avoid overtime requirements, "solely by fashioning an idealized job description that had little basis in reality." *Velazquez*, 603 F. App'x at 586.

The Government's emphasis on variation also goes to case manageability. It argues that "a collective action would necessarily involve individualized inquiries into each ACC's daily work activities," which "would not promote judicial efficiency." Def.'s Resp. at 45. Courts do address manageability concerns, such as the need to conduct individualized inquiries, at the first conditional certification step. *See Smith I*, 156 Fed. Cl. at 483. But these concerns go both ways. Individual inquiry as a rule undermines the "efficiency gains the FLSA collective action process seeks to achieve." *Id.*; *see also Meyer*, 344 F. Supp. 3d at 207–08 (finding that affirmative defenses are more appropriately considered during the decertification stage).

At this stage in conditional certification, it is not the Plaintiff's burden to prove that an FLSA violation did *in fact* occur. Nor is plaintiff required to prove that all ACCs experience the same working conditions or same denial of overtime pay. Instead, Plaintiff must only show that she was "similarly situated" to other ACCs in regard to the FLSA claim based on the evidence submitted. The merits are left for the next procedural step. *Gayle*, 85 Fed. Cl. at 77 ("In deciding whether to conditionally certify a collective action, 'the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations.'" (quoting *Lynch*, 491 F. Supp. 2d at 368)). Plaintiff has provided a sufficient factual basis to grant nationwide conditional certification for ACCs employed at the VCS. Accordingly, Plaintiff's Renewed Motion is granted.

### B.     Manner of Notice

The Court has wide discretion in facilitating the notice process, including directing discovery of potential plaintiffs at the agency. *See Smith I*, 156 Fed. Cl. at 483–84. In *Smith I*, the court directed the Government to provide plaintiff the names, last known mailing addresses, and job titles of putative collective action members for mail-only notification at the Palo Alto and Menlo Park canteen locations. *Id.* at 484. Plaintiff asks for the same discovery for nationwide ACCs, with the additional request to supplement mail notification with email. Pl.'s Mot. at 22, 29; Nov. 2, 2022 Hr'g Tr. at 34:19–35:3. The Government agrees that both regular

mail and email are appropriate for discovery.  *See* Nov. 2, 2022 Hr'g Tr. at 32:23, 34:4–8.[6]
Accordingly, the Government is directed to provide to Plaintiff in electronic format the names,
last known mailing addresses, and job titles of all putative collective action members for ACCs
who worked at nationwide VCS locations in the past three years, consistent with this Opinion
and Order.

C.      **Equitable Tolling**

Lastly, Plaintiff requests equitable tolling of potential collective action members' claims.
*See* Pl.'s Mot. at 19.  Generally, the statute of limitations on FLSA claims is three years from
accrual for willful violations, or violations where "the employer either knew or showed reckless
disregard for the matter of whether its conduct was prohibited by the statute."  *McLaughlin v.
Richland Shoe Co.*, 486 U.S. 128, 129, 133 (1988); 29 U.S.C. § 255(a).  The Government
acknowledges that Plaintiff adequately pled a willful violation and accompanying three-year
statute of limitations period.  *Smith I*, 156 Fed. Cl. at 484 n.7; Compl. ¶ 26.  This limitations
period is tolled for collective action members when they file a consent-to-sue form.  *See*
29 U.S.C. § 256.

After Plaintiff's initial motion for conditional certification was denied, Plaintiff's counsel
contacted ACCs who worked at other canteens, some of whom provided declarations and signed
consent-to-sue forms to join the collective action.  *See, e.g.*, Notice of Filling Opt In Consent
Form, ECF No. 44.  All of these consents were stricken from the record for failing to comply
with the signature requirements for electronic filings and because all but one consent form came
from employees stationed outside Palo Alto and Menlo Park.  *See* Order, ECF No. 51.  Since the
date these consents were stricken, five additional individuals have signed consent-to-sue forms.
*See* Pl.'s Mot. Ex. 12.  However, Plaintiff has not filed these forms with the Court under the prior
order to strike.

Plaintiff now "requests that the statute of limitations be tolled for all individuals who
have signed the consent to sue forms, but whose forms were either stricken by the Court, or not
yet filed as a result of the Court's April 5, 2022 Order."  Pl.'s Mot. at 20.  A similar request to
equitably toll claims from the date Plaintiff requested contact information was made in *Smith I*.
*See* 156 Fed. Cl. at 484.  That court recognized that the Court of Appeals for the Federal Circuit
allows for limited exceptions for equitable tolling, which are deployed "sparingly," none of
which applied to Plaintiff's case.  *Id.* at 485.

This time, Plaintiff argues that regardless of the Court's approved limited notice for Palo
Alto and Menlo Park, "consent-to-sue forms may be filed outside of the conditional certification
notice."  *Id.* at 21 (citing *Augustyniak v. Lowe's Home Ctr., LLC*, No. 14-CV-00488, 2016

---

[6]  While the *Smith I* court limited the notice to regular mail only, both parties now agree that
supplementing regular mail notification with email notification is the most efficient approach for
contacting potential collective action members while balancing privacy concerns.  *See* Nov. 2,
2022 Hr'g Tr. at 32:16–35:5.  Some form of electronic notice beyond regular mail also reflects
the reality of modern communication.  *See Belt v. P.F. Chang's China Bistro, Inc.*, No. 18-3831,
2020 WL 3829026, at *25 (E.D. Pa. July 8, 2020).

WL 462346, at *1–2 (W.D.N.Y. Feb. 8, 2016)) ("Since the sole consequence of conditional certification is sending of court-approved written notice . . . it follows that the sole consequence of *denying* conditional certification is that the notice is *not sent*, and nothing in the text of the statute prevents plaintiffs from opting in to the action by filing consents with the district court."). Plaintiff claims that "tolling is warranted here, because consent-to-sue forms may be filed outside of the conditional certification notice, and consequently, should not have been stricken." Pl.'s Mot. at 21; *see id.* ("[A]fter the Court denied nationwide conditional certification, a notice to a nationwide class was *not* sent, but this should not prevent ACCs from other locations . . . from opting into this action, even before Plaintiff's renewed motion was filed and decided."); *Brown v. Barnes and Noble, Inc.*, 2018 WL 3105068, at *2 (S.D.N.Y. June 25, 2018).

First, Plaintiff is correct that potential plaintiffs can re-file consent-to-sue forms. Because nationwide conditional certification would permit any potential plaintiff to opt-in to this action, potential plaintiffs whose consent-to-sue forms were denied may again opt-in to the collective action now that it is nationwide. However, this Court does not change *Smith I*'s stance on equitable tolling. While the extent of equitable tolling under the FLSA has not been fully resolved by the Federal Circuit, limitations on the Government's waiver of sovereign immunity are strictly construed. *Soriano v. United States*, 352 U.S. 270, 276 (1957); *see Crawley v. United States*, 157 Fed. Cl. 178, 181 (2021) (citing *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 95–96 (1990)).

Equitable tolling has only been permitted in "certain limited circumstances." *Abbey v. United States*, 106 Fed. Cl. 254, 266 (2012) (collecting cases). As the *Smith I* court noted, "[e]quitable tolling is appropriate only where the plaintiff (1) filed a defective pleading during the statutory period, (2) was induced or tricked by the defendant into allowing the deadline to pass, or (3) suffered an injury that was inherently unknowable at the time the cause of action accrued." *See Martinez*, 333 F.3d at 1301, 1318–19; *Martin v. United States*, No. 13-cv-834C, 2015 WL 12791601, at *3 (Fed. Cl. Oct. 15, 2015). None of these exceptions apply here. The stricken consent forms (not defective pleadings) were filed by *potential* plaintiffs, not Ms. Smith. Nor has Plaintiff alleged that she was tricked by the Government into allowing the deadline to pass or suffered an inherently unknowable injury. *See Smith I*, 156 Fed. Cl. at 485.

Plaintiff is correct that "the only requirement for an opt-in plaintiff is to be 'similarly situated' to the named plaintiff," and that "nothing in the text of the statute prevents plaintiffs from opting into the action" at any time. Pl.'s Mot. at 21 (first citing *Augustyniak*, 2016 WL 462346, at *1–2; and then citing *Gonyer v. Vane Line Bunkering, Inc.*, 32 F. Supp. 3d 514, 516, 517 (S.D.N.Y. 2014). Thus, a potential plaintiff could typically opt-in to a collective action, even when limited (or no) notice is granted. But courts are granted "wide discretion to manage joinder in FLSA collective actions." *Smith I*, 156 Fed. Cl. at 478 (citing *Hoffmann-La Roche*, 493 U.S. at 169–70). When *Smith I* struck consent-to-sue forms from proposed plaintiffs, it did so in part because of the "limited . . . pool of employees eligible to opt into the collective action at this time." April 5, 2022 Order at 1, ECF No. 51.

Within this wide discretion, *Smith I* approved conditional certification for notice to Palo Alto and Menlo Park ACCs. *See* 156 Fed. Cl. at 483 ("The Court, therefore, grants conditional

certification of a collective action limited to the Palo Alto and Menlo Park, California canteens."). Moreover, it "limited the pool of employees eligible to opt into the collective action . . . to the Palo Alto and Menlo [P]ark canteens." Nov. 19, 2021 Order, ECF No. 35 ("[T]he Court's October 15, 2021 Order). For this reason, the Court excluded consent-to-sue forms from any plaintiff outside of the limited collective action, such as those who typically could have opted-in to the collective action regardless of whether notice was granted.

Therefore, even if potential plaintiffs were permitted to file consent forms prior to conditional certification, *Smith I* was within its discretion to limit the collective action's scope. Plaintiff has not moved to reconsider the prior holding in this litigation, but instead asks this Court to equitably toll a deadline already rejected in a prior ruling in this case. But no exception for equitable tolling applies, and this Court follows the law of the case. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). Potential plaintiffs with stricken consent-to-sue forms may re-file as part of Plaintiff's now-granted nationwide conditional certification, assuming their claims are timely.

## IV.   Conclusion

Plaintiff is entitled to issue notice for a nationwide collective action, and the parties can move forward in discovery to the next stage of conditional certification.

For the reasons set forth above:

1.   Plaintiff's Renewed Motion for Nationwide Conditional Certification is **GRANTED**;

2.   Plaintiff's request for nationwide opt-in consents to ACCs who worked in the last three years is **GRANTED**; the Government is **DIRECTED** to produce mail and email contact information for all ACCs who worked at VCS canteens in the past three years;

3.   The parties are **DIRECTED** to file a joint status report with a revised proposed notice and proposed schedule for future proceedings by **January 9, 2023**;

4.   Plaintiff's request for equitable tolling of the statute of limitations is **DENIED**.


**IT IS SO ORDERED.**


　　　　　　　　　　　　　　 s/ Carolyn N. Lerner
　　　　　　　　　　　　　　CAROLYN N. LERNER
　　　　　　　　　　　　　　Judge